IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 22, 2006 Session

# ANTHONY FRANKLIN v. SWIFT TRANSPORTATION CO., INC.

**A Direct Appeal from the Circuit Court for Shelby County**
**No. CT-006832-02      The Honorable Kay S. Robilio, Judge**

---

**No. W2005-01062-COA-R3-CV - Filed July 12, 2006**

---

This is a retaliatory discharge case. The former employee of a trucking company filed suit against the trucking company for statutory and common law retaliatory discharge, alleging that his employment was terminated due to his refusal to violate a Tennessee Department of Safety regulation that required the truck to carry an original "cab card" showing registration. The employer had directed the employee truck driver to deliver merchandise to a customer, assigning him a particular truck. The original cab card for the truck could not be found, so the employer gave the employee a photocopy of the cab card. The employee refused to drive the truck with only a photocopy, and another truck could not be located. The next day, the employee truck driver was fired. The truck driver sued the employer trucking company for retaliatory discharge, alleging that his employment was discharged for refusing to participate in an illegal activity. The Shelby County Circuit Court entered judgment on a jury verdict in favor of the employee. We reverse, finding that the employee's refusal to perform the assigned work based on the regulation requiring the original cab card, as opposed to a photocopy, did not further important public policy concerns, and therefore would not support a claim of retaliatory discharge.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which DAVID R. FARMER, J., joined. W. FRANK CRAWFORD, P.J., W.S., dissented.

Jeff Weintraub, J. Gregory Grisham and C. Michael Becker of Memphis, Tennessee for Appellant, Swift Transportation, Inc.

Donald A. Donati and William B. Ryan of Memphis, Tennessee for Appellee, Anthony Franklin

**OPINION**

Plaintiff/Appellee Anthony Franklin was hired by Defendant/Appellant Swift Transportation Co., Inc. ("Swift")[1] in October 2000 as an over-the-road driver. After completing a thirty-day training program, Franklin was assigned as a driver for a dedicated account for the Dollar Tree stores, a chain of convenience-type retail stores. In this position, the driver delivers merchandise regionally to store locations, many in small towns. The assignment required a highly skilled or very experienced driver. For an account such as this, a driver in Memphis would be able to be home with his family three to four nights a week, normally on the weekends. This would give the driver more time at home than a "regular line haul," for which a driver would typically be away from home three weeks at a time. In the normal course of his employment as a dedicated Dollar Tree driver, Franklin would receive a dispatch call, and then go to the Dollar Tree distribution facility in Olive Branch, Mississippi to pick up a trailer loaded with merchandise to be delivered to a Dollar Tree store in the southeast region of the United States. Generally, Franklin drove two shipments a week and grossed between $700 and $1,000 per week.

The Dollar Tree account was a lucrative, important account for Swift. Dollar Tree had very high "on time" requirements for its merchandise deliveries, and Swift would be penalized if its on-time performance fell below ninety-five percent. Failure to maintain an on-time delivery schedule would also affect Swift's ability to keep the account. It was important for a driver on an account such as this to pick up his trailer of merchandise by the appointed time so that he would get the required eight-hour rest break to complete the run.

Swift at that time was a "forced dispatch" company, which meant that, once a driver was assigned to deliver a load, he could not refuse to do so unless there was an emergency. Specifically, dedicated drivers for Dollar Tree were not permitted to refuse to deliver a load.

On December 2, 2001, Franklin received a dispatch call and went to the Dollar Tree facility in Olive Branch, Mississippi. There, Franklin was to pick up a trailer of merchandise and deliver it to a Dollar Tree location in the Dallas, Texas area by the next morning. After picking up the trailer, Franklin went to the Swift terminal in Memphis, Tennessee, to get fuel and have his truck inspected by a maintenance employee. When he arrived, Franklin was told by the maintenance employee that his truck needed to be taken out of service for routine maintenance that was due on the vehicle. Franklin then contacted the weekend dispatcher, Kim Rogers ("Rogers"), to inform her that his truck had been taken out of service. Consequently, Rogers assigned Franklin a loaner truck, truck #16064.

Franklin located truck #16064, and performed the mandatory pre-trip inspection of the truck, as required by Swift. The inspection included checking all paperwork in the truck, such as

---

[1] Franklin was originally hired by M.S. Carriers. In the summer of 2001, Swift Transportation Co., Inc. acquired M.S. Carriers. M.S. Carriers was voluntarily dismissed from this action by Order of the trial court on March 21, 2005. The employer will be referred to herein as "Swift."

maintenance and registration permits kept in the truck's permit book. The truck checked out satisfactorily, except that truck #16064's International Registration Plan card ("IRP cab card") was missing. The IRP cab card is a pink-colored motor registration card issued by the State of Tennessee, listing all of the states in which the vehicle is registered to operate.

Franklin contacted Rogers again to tell her that the original IRP cab card was missing from truck #16064. In response, Rogers told Franklin to "run with [the truck] anyway." Franklin told Rogers that he did not feel comfortable driving the truck without the original IRP cab card. Rogers told Franklin to contact the road maintenance records department to find out whether they had a back-up original of the IRP cab card for truck #16064. Franklin contacted the road maintenance records department and was told that they only had a black and white photocopy of the IRP cab card for truck #16064. Franklin called Rogers and told her that the road maintenance records department only had a photocopy of the IRP cab card. Rogers told Franklin to take truck #16064 with the photocopy of the IRP cab card. When Franklin expressed reluctance, she assured him that driving the truck with a photocopied cab card would not be a moving violation or a D.O.T. violation, that it would not go on his driving record, and that if he were stopped for it and any fine was assessed, or anything else happened as a result of only having a copy, the company would pay for it. Despite this, Franklin refused to drive the truck without the original IRP cab card and asked Rogers to locate another loaner truck. Rogers acquiesced, and assigned Franklin a second loaner truck.

Considerable time had passed by this point. Franklin searched for the second loaner truck, but was unable to locate it on the Swift lot. Finally, Franklin called the dispatch office to tell them that he could not find the second loaner truck. Franklin was then informed by the dispatch staff that the delivery load had been taken off of him, and that he needed to contact the account manager for the Dollar Tree account the next morning. Before leaving the Swift terminal, Franklin discovered that the second loaner truck that he had been trying to locate on the Memphis Swift lot was actually in Brownsville, Tennessee.

The next morning, Monday, December 3, 2001, Franklin went to the Swift offices to meet with the account manager for the Dollar Tree account, Montel Maners. When he arrived at the offices, Franklin learned that he had been terminated from his job. That morning, at 8:05 a.m., Debbie Ashley, Franklin's immediate supervisor, made an entry into Swift's computer system that Franklin had been terminated for refusing a load. After learning of his termination, Franklin went to the Swift Employee Relations department. Franklin was told to write a summary of the events that occurred, which he did. Franklin was then told that Swift employee Jerry Stairs ("Stairs") needed to review the appeal letter, and that Franklin would be contacted after Stairs' review. On December 4, 2001, Franklin contacted Stairs to discuss his appeal. A meeting was set for December 5, 2001. At the December 5, 2001 meeting, Stairs told Franklin that he had contacted Montel Maners, but nothing had been resolved. On December 31, 2001, Franklin received a separation notice from Swift, stating that he had quit his employment to take another job.

On December 2, 2002, Franklin filed a lawsuit against Swift for statutory and common law retaliatory discharge, alleging that his employment was terminated due to his refusal to violate safety

-3-

provisions of Tennessee Motor Carriers Act. Franklin sought back pay, front pay in lieu of reinstatement, and compensatory and punitive damages. Swift answered and asserted the affirmative defenses that Franklin failed to state a claim upon which relief could be granted, that Franklin's claims were pre-empted by the Surface Transportation Assistance Act of 1982, 42 U.S.C. § 31105, and that Franklin's employment with Swift would have ended regardless of his refusal to drive a truck that was allegedly not in compliance with the Tennessee Motor Carriers Act and its implementing regulations.

On October 15, 2004, Swift filed a motion for summary judgment, arguing that Franklin could not establish a cause of action for retaliatory discharge because Franklin's refusal to drive loaner truck number #16064 was a lawful reason for Swift to terminate his employment. Swift asserted that Franklin did not have sufficient reason for refusing to take the truck because he personally did not know of any inspectors who would not accept a photocopy of the IRP cab card, as opposed to the original IRP cab card. On January 28, 2005, the trial court, after hearing arguments from counsel, denied Swift's motion for summary judgment. On February 8, 2005, the trial court entered an order denying Swift's motion for summary judgement; absent from the order was any explanation of the trial court's legal conclusions. On March 14, 2005, Swift filed a motion for the trial court's statement of legal grounds for its denial of Swift's motion for summary judgment.[2]

The jury trial began on March 21, 2005. At the close of Franklin's case, Swift made a motion for directed verdict pursuant to Rule 50 of the Tennessee Rules of Civil Procedure. Swift argued that Tennessee law did not require the original, as opposed to a copy, of the IRP cab card, and that driving a commercial motor vehicle without an original IRP cab card did not rise to the level of clear public policy in Tennessee relating to health, safety and public welfare. The trial court denied Swift's motion for directed verdict. At the conclusion of the proof, Swift renewed its motion for directed verdict, based on the same argument. The trial court again denied Swift's motion for directed verdict. Following closing arguments, the jury returned a verdict in favor of Franklin, and awarded Franklin lost wages in the amount of $51,878.00.

On April 27, 2005, Swift filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. Swift argued that the trial court erred in denying its motion for summary judgment, as well as its later motions for directed verdict, since the requirement to keep the original, as opposed to a photocopy, of the IRP cab card in the truck cab did not constitute a clear and unambiguous public policy of the State of Tennessee relating to safety, health, or public welfare. For this reason, Swift argued, a termination based on a refusal to drive a truck without the original IRP cab card did not constitute actionable retaliatory discharge or whistleblowing under the Tennessee common law or the Tennessee Public Protection Act. On May 2, 2005, Franklin filed a motion for an order awarding prejudgment interest, which was denied by the trial court. On May 25,

---

[2]Swift's brief explains that the trial court later stated that Franklin had established the existence of a clear public policy in Tennessee that it was unlawful to operate a commercial motor vehicle without the original of the IRP cab card in the cab. From our review of the record, however, Swift's citation to the record for this proposition is incorrect. This Court was unable to locate any clarification from the trial court explaining the legal bases for denying Swift's motion for summary judgment except for the trial court's statement that it felt it was a "colorable claim."

2005, the trial court entered an order denying Swift's motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. From these orders, Swift now appeals.

On appeal, Swift asserts that the trial court erred in (1) failing to grant Swift's motion for summary judgment; (2) failing to direct a verdict in Swift's favor; and, (3) denying Swift's motion for judgment notwithstanding the verdict. Swift makes the same argument before this Court that it made to the trial court, that is, that the termination of an at-will employee for refusing to operate a commercial motor vehicle with a photocopy of the IRP cab card, as opposed to the original, does not violate a clear and unambiguous public policy in the State of Tennessee related to health, safety, or welfare sufficient to support a claim for retaliatory discharge under the common law or the Tennessee Public Protection Act. In response, Franklin argues that his refusal to operate a commercial motor vehicle without the original of the IRP cab card as required by Tennessee law was the equivalent of refusing to participate in illegal activities, and, was therefore sufficient to establish a claim for retaliatory discharge under the common law or the Tennessee Public Protection Act. Franklin also raises an issue on appeal, asserting that the trial court erred in denying his motion for prejudgment interest.

As to Swift's assertion that the trial court erred in denying its motion for summary judgment, that issue will not be reviewed on appeal. "A trial court's denial of a motion for summary judgment, predicated upon the existence of a genuine issue of material fact, is not reviewable on appeal when a judgment is subsequently rendered after a trial on the merits." *Bradford v. City of Clarksville,* 885 S.W.2d 78 (Tenn. Ct. App. 1994). Therefore, the denial of Swift's summary judgment motion is not reviewable on appeal.

Swift asserts on appeal that the trial court erred in failing to direct a verdict in its favor, at the close of Franklin's proof, and, again, when Swift renewed its motion for directed verdict at the conclusion of the proof, on the basis that the regulatory infraction by Swift was insufficient to support Franklin's claim of retaliatory discharge. A directed verdict under either Tenn. R. Civ. P. 50.01 or 50.02 is appropriate only when, after taking the strongest legitimate view of the evidence favoring the opponent and drawing all reasonable inferences in favor of that opponent, reasonable minds cannot differ as to the conclusions to be drawn from the evidence. *Alexander v. Armentrout,* 24 S.W.3d 267, 271 (Tenn. 2000); *Eaton v. McLain,* 891 S.W.2d 587, 590 (Tenn. 1994); *Ingram v. Earthman,* 993 S.W.2d 611, 627 (Tenn. Ct. App. 1998). A post-trial motion for entry of judgment in accordance with a motion for a directed verdict made during the trial is gauged by the same standard. *Holmes v. Wilson,* 551 S.W.2d 682, 685 (Tenn. 1977) (citing *Vaughan v. Shelton,* 514 S.W.2d 870, 874 (Tenn. Ct. App. 1974); *Keller v. East Tennessee Production Credit Ass'n,* 501 S.W.2d 810, 812 (Tenn. Ct. App. 1973)). Under this standard of review, we address the substantive issue raised by Swift on appeal, namely, whether Franklin can sustain a cause of action for retaliatory discharge for his refusal to drive Swift's truck with a photocopy of the IRP cab card, rather than the original cab card.

The employment-at-will doctrine is a bedrock of Tennessee common law. Under this doctrine, employment for an indefinite term may be terminated by either the employer or the

employee at any time, for good cause, bad cause, or no cause at all. ***Guy v. Mutual of Omaha Ins. Co.***, 79 S.W.3d 528, 534-35 (Tenn. 2002). This traditional rule, however, is not absolute; restrictions have been imposed on the right of the employer to discharge an employee. ***Id.*** at 535. In ***Chism v. Mid-South Milling Co.***, 762 S.W.2d 552, 556 (Tenn. 1988), the Tennessee Supreme Court indicated its willingness to recognize a claim for retaliatory discharge where the employee is discharged in contravention of public policy. ***See also Guy***, 79 S.W.3d at 535; ***Clanton v. Cain-Sloan Co.***, 677 S.W.2d 441 (Tenn. 1984). In ***Chism***, the plaintiff alleged that he was discharged because he insisted that his employer comply with the Internal Revenue Code. ***Chism***, 762 S.W.2d at 554. The ***Chism*** court discussed the parameters of a cause of action for retaliatory discharge:

> It is obvious that the exception cannot be permitted to consume or eliminate the general rule. . . . To be liable for retaliatory discharge in cases such as this, the employer must violate a clear public policy. Usually this policy will be evidenced by an unambiguous constitutional, statutory or regulatory provision.

***Id.*** at 556. The ***Chism*** court went on to recite "[e]xamples of clearly defined public policies which warrant the protection provided by this cause of action. . . ." ***Id.*** These examples included cases in which the employee was discharged for refusing to commit perjury, for insisting on obeying a lawful subpoena, for refusing to seek to be excused from jury duty, for refusing to falsely certify the required testing of consumer products, and for reporting consumer fraud violations. ***Id.*** (citations omitted). The ***Chism*** court commented: "In each of these cases . . . very specific statutory violations were charged, and usually the employee's personal exposure to civil or criminal sanctions was emphasized." ***Id.*** The court found the plaintiff's allegations in his complaint insufficient to support a claim of retaliatory discharge, stating: "In order to state a claim for relief for this very exceptional tort action, the pleader must show clear violation of some well-defined and established public policy." ***Id.***

Two years after the decision in ***Chism***, the Tennessee legislature codified the common-law cause of action for retaliatory discharge by enacting the Tennessee Public Protection Act, which currently provides:

> (a) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
> * * *
> (c) As used in this section, "illegal activities" means activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare.
> (d)(1) Any employee terminated in violation of Subsection (a) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn. Code Ann. § 50-1-304(a), (c) and (d)(1) (2005). By enacting the Public Protection Act, the legislature recognized the importance of encouraging employees to report violations "of those laws

and regulations 'intended to protect the public health, safety or welfare.' " *Guy*, 79 S.W.3d at 537. In *Guy*, the court held that the Public Protection Act "is cumulative to, and does not preempt, the common law tort remedy for retaliatory discharge claims where the employee was discharged for reporting illegal or unethical conduct." *Id.*

In this case, Franklin asserts a claim for retaliatory discharge under both the common law and the Tennessee Public Protection Act. To prevail under the Public Protection Act, the plaintiff must establish (1) his status as an employee of the defendant employer; (2) his refusal to participate in, or remain silent about, "illegal activities" as defined under the Act; (3) his termination; and (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and his termination. T.C.A. § 50-1-304. The elements required in order to prove a common law retaliatory discharge claim are similar; the plaintiff must show (1) that an employment-at-will relationship existed; (2) that he was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy. *Crews v. Buckman Laboratories Int'l, Inc.,* 78 S.W.3d at 862; *see also Guy,* 79 S.W.3d at 535; *Mason v. Seaton,* 942 S.W.2d 470, 474 (Tenn. 1997); *Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 717 (Tenn. 1997); *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 899 (Tenn. 1992); *Chism,* 762 S.W.2d at 556.

On appeal, it is undisputed that Franklin was an employee of Swift and that he was discharged. The jury found a causal relationship between his discharge and his refusal to drive the loaner truck because it had a photocopy of the IRP cab card instead of the original, and Swift does not assert on appeal that there was insufficient evidence to support this finding.

This appeal turns, then, on the final element, similar under the common law and the Public Protection Act. Under the Public Protection Act, it must be found that the violation by the employer constitutes an "illegal activity," defined as "activities that are in violation of the criminal or civil code of this state or the United States or [a] regulation intended to protect the public health, safety or welfare." T. C. A. § 51-1-304(c). Under the common law, the motivating factor for the discharge must be the employee's compliance with "a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Crews*, 78 S.W.3d at 862. The issue becomes whether Swift's regulatory violation rises to this level.

A commercial vehicle such as the Swift truck at issue in this case must be licensed and registered to operate in the State of Tennessee. Under Tennessee Code Annotated § 55-4-101(a)(2), the registration and fees are a privilege tax which must be paid in order to operate in Tennessee. Other states and jurisdictions require registration as well, which becomes a practical problem for commercial vehicles operating in interstate commerce, because such vehicles would have to register in numerous jurisdictions. Consequently, states of the United States and some provinces in Canada adopted the International Registration Plan ("IRP"), a registration reciprocity agreement under which the registration fees for an individual vehicle are allocated among the jurisdictions in which the

vehicle operates. Under the IRP, the vehicle is issued one license plate and one registration, called an IRP cab card, which shows that the vehicle is properly registered to operate in multiple jurisdictions.

In this case, there is no allegation that the truck at issue did not meet proper safety standards, that the required fees had not been paid, or that the vehicle was not properly registered. At issue is the proof of such registration that was to be carried in the vehicle.

Tennessee Code Annotated § 55-4-108(a) states that a certificate of registration must be carried in the vehicle, available to show to an employee of the Tennessee Department of Transportation. Under this statute, the owner of the vehicle is permitted to keep in the vehicle either the original certificate of registration or a copy of it. T.C.A. § 55-4-108(a) (1998).

The requirement for proof of registration is narrowed, however, by a regulation issued by the Tennessee Department of Safety. The regulation states that the required proof of registration under the IRP is "a Cab Card and Certificate of Registration for each vehicle so proportionally registered." Tenn. Dept. of Safety, Rule 1340-5-2-.01. The regulations address the proof of registration to be carried in the vehicle: "1340-5-2-.02 Placement of Card. For a vehicle proportionally registered, it is required that the original of the Cab Card be in the cab of the vehicle during its operation." Thus, while the statute appears to allow a copy of the proof of registration, the regulation requires that the *original* IRP cab card be kept in the vehicle. This requirement is noted on the face of the pink-colored cab card.

In this case, when Franklin inspected truck #16064 and discovered that the IRP cab card was missing, he was given a black-and-white photocopy of the card and directed to make the Dollar Tree run with the photocopied cab card. When Franklin expressed misgivings about this, he was assured that operating the vehicle with a photocopy of the card was not a moving violation or a D.O.T. violation, that it would not go on his driving record, and that if he were stopped because of the photocopied card, Swift would pay any fine assessed. Nevertheless, Franklin refused and asked for another truck. After trying to locate yet another truck, Swift finally took Franklin off of the assignment.

Swift notes that this infraction, carrying a photocopy of the IRP cab card instead of the original cab card, is not a "violation of the criminal or civil code" of Tennessee. *See* T.C.A. § 50-1-304(c) (definition of "illegal activities"). Rather, it is a violation of a regulation which Swift contends does not implicate "the public health, safety or welfare" under the Public Protection act and does not rise to the level of a clear public policy evidenced by an unambiguous regulatory provision. *Id.*; *see Guy*, 79 S.W.3d at 535. Therefore, it cannot support either a statutory or common law claim of retaliatory discharge.

In response, Franklin argues that, pursuant to the Tennessee Supreme Court case of *Mason v. Seaton,* 942 S.W.2d. 470,472 (Tenn. 1997), an employee can satisfy the second element of a claim under the Tennessee Public Protection Act (the requirement of proving his refusal to participate in,

or remain silent about, illegal activities) by showing that he had "reasonable cause to believe a law, regulation, or rule has been violated or will be violated." **Id.** Franklin maintains that he reasonably believed that he needed to carry the original IRP cab card when operating his truck, and that his belief was justified. At trial, Franklin recounted an occasion on which he was detained at a weigh station in Kansas because he could not produce the original IRP cab card. Franklin contacted the head of Swift's permit department, Dora Griffin, who faxed a copy of the IRP cab card to the Kansas inspector. The faxed copy was accepted and Franklin was allowed to proceed with his load. After that incident, Griffin stressed to Franklin that the original cab card should remain in the truck, because the Kansas officers did not have to accept a copy, and that he could be subjected to fines and penalties for failing to have it. Griffin, who had been the head of Swift's permit department for over ten years, testified at trial that it was not "legal to run in any state without a cab card. . . . The law on the registration, it says you must have the original in the permit book on the truck because copies were not legal." Franklin notes as well that the face of the IRP cab card contains language requiring that the original IRP cab card be maintained in the cab during operation. Franklin asserts that his belief that he would be breaking the law, subjecting himself to fines, penalties, and possible delay if he operated truck # 16064 without the original IRP cab card, is sufficient to satisfy the requirements under the Public Protection Act.

As to Franklin's claim for common law retaliatory discharge, Franklin acknowledges that, to be cognizable, a claim of common law retaliatory discharge must evidence a violation of "a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision. . . ." **Mason**, 942 S.W.2d at 475 (citing **Reynolds**, 887 S.W.2d at 823). On appeal, Franklin does not argue that Tenn. Comp. R. & Regs. 1340-5-2-.02, which requires the original cab card, is a clear expression of Tennessee public policy; rather, the clear and unambiguous public policy that Franklin asserts is the right of a Tennessee employee to be able to refuse to participate in an illegal activity in the workplace. In support of this argument, Franklin cites **Watson v. Cleveland Chair Company**, in which the Tennessee Supreme Court stated "that a cause of action for retaliatory discharge arises when an at-will employee is terminated solely for refusing to participate, continue to participate, or remain silent about illegal activities." **Watson v. Cleveland Chair Co.**, 789 S.W.2d 538, 544 (Tenn. 1989).

Franklin is, of course, correct in his assertion that the law of retaliatory discharge stems from Tennessee public policy that an employee should not be placed in the moral, ethical and legal dilemma of being forced to choose between reporting or participating in illegal activities and keeping his job. **See Henderson v. Corrs. Corp. of America,** 918 F.Supp. 204, 210 (E.D. Tenn. 1996); **Griggs v. Coca-Cola Employees' Credit Union,** 909 F.Supp. 1059, 1064 (E.D. Tenn. 1995). That does not, however, end the inquiry. Under both the Public Protection Act and the common law, the "illegal activity" or violation by the employer must implicate important public policy concerns as well.

As noted above, the earliest Tennessee cases recognizing retaliatory discharge have emphasized that it is an important, but narrow, exception to the employment-at-will doctrine. **See Chism**, 762 S.W.2d at 556. More recent cases have underscored the qualified nature of the cause

of action, noting that retaliatory discharge is applicable only "in limited circumstances, [where] certain well-defined, unambiguous principles of public policy confer upon employees implicit rights which must not be circumscribed or chilled by the potential of termination. *Stein v. Davidson Hotel,* 945 S.W.2d 714, 717 (Tenn. 1997).

In *Guy v. Mutual of Omaha Insurance Company*, the court discussed at length the requirement that the discharged employee demonstrate that his actions implicated important public policy concerns.[3] The plaintiff in *Guy* alleged that he was discharged because he reported to authorities the fraudulent actions of an insurance agent who had misappropriated the funds of a client. *Guy*, 79 S.W.3d at 531-33. He relied on Tennessee insurance statutes "as evidence of a clear expression of the public policy in this state with respect to protecting the public from the fraudulent activity of insurance agents." *Id.* at 537. Under the heading "The Public Policy Interest of Protecting Consumers From Insurance Fraud," the court in *Guy* framed the issue as "whether the plaintiff has asserted a 'well defined and established' public policy as the basis for his retaliatory discharge claim." *Id.* at 537. It observed that, under both the Act and the common law, the plaintiff must prove that his actions " 'serve[] a public purpose [that] should be protected. So long as the employees' actions . . . seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged.' " *Id.* at 537 n.4. The *Guy* court emphasized that it was not enough for the plaintiff to simply show that the employer violated a law or regulation, stating, "Our inquiry . . . is not limited to whether a particular law or regulation has been violated; rather, our inquiry focuses on whether some '*important* public policy interest embodied in the law has been furthered by the whistleblowing activity.' " *Id.* at 538 (emphasis added) (quoting *Gutierrez v. Sundancer Indian Jewelry*, 868 P.2d 1266, 1273 (N.M. 1993)). The *Guy* Court recognized the public policy interest embodied in encouraging the reporting of the insurance agent's fraudulent actions, quoting an early case which recounted "painful cases . . . where . . . people have given up their scanty earnings . . . because of unauthorized misrepresentations by unscrupulous agents. . . ." *Id.* (quoting *Independent Life Ins. Co. v. Rodgers*, 55 S.W.2d 767, 770 (Tenn. 1933)).

Likewise, other appellate decisions on retaliatory discharge in this State have involved activities which implicated an important public policy interest. *See*, *e.g.*, *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997) (plaintiff discharged for reporting hotel's fire code violations and dangerous working conditions); *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822 (Tenn. 1994) (plaintiff discharged because he refused to violate regulation which requires that the driver of a commercial motor vehicle inspect the vehicle and be satisfied that the vehicle is in safe operating condition before it is operated on a public road); *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 865 (Tenn. 2002) (plaintiff discharged for reporting in-house counsel practicing law without being properly licensed; court found "the existence of a clear public policy evidenced by the ethical duty [under the Tennessee Code of Professional Responsibility] not to aid in the unauthorized practice of law.").

---

[3]The plaintiff in *Guy* did not assert a claim under the Public Protection Act, only under the common law. 79 S.W.3d at 535-36.

In this case, Franklin acknowledged at trial that he was aware that the Dollar Tree account, for which he was a dedicated driver, was important to Swift, and involved time-sensitive deliveries requiring highly-skilled drivers. It is undisputed that the employer at that time had a "forced dispatch" policy under which a driver assigned a load was not permitted to refuse to do so unless it was an emergency, and that in particular, dedicated drivers for the Dollar Tree account could not refuse to deliver a load. Franklin was assured that driving the truck with a photocopy of the IRP cab card would not be a moving violation or a D.O.T. violation, that it would not go on his driving record, and that if he were stopped, Swift would pay any fines assessed. Despite all of this, when Swift could not readily locate the original IRP cab card and gave Franklin a photocopy of the card to put in the cab of the truck, Franklin refused to use the truck to deliver the Dollar Tree merchandise.

Under the reasoning urged by Franklin, *any* regulatory infraction by an employer, no matter how minor, can justify an employee's refusal to perform his assigned duties. Indeed, it is hard to imagine a more *de minimus* regulatory violation than the infraction on which Franklin bases his claim of retaliatory discharge in this case, namely, having a photocopied cab card instead of the original. The Court in *Guy v. Mutual of Omaha* stated clearly that we do not simply look at whether a law or regulation has been violated, but "rather, our inquiry focuses on whether some important public policy interest embodied in the law has been furthered" by the employee's actions. 79 S.W.3d at 538.

Finding that *any* regulatory infraction by an employer, no matter how minor, can support a claim of retaliatory discharge would be a clear extension of the law, well beyond the boundaries of any prior Tennessee decision. Such an extension of the law has been rejected by at least one other state. In a similar case, *DeSoto v. Yellow Freight Systems, Inc.*, 957 F.2d 655 (9th Cir. 1992), a plaintiff truck driver mistakenly thought that he could not operate his employer's truck legally because it had expired registration papers and an expired vehicle tag. The employer assured the plaintiff that it would accept responsibility for the consequences of any lack of registration. Despite this, the truck driver refused to use the vehicle to deliver a load, so the employer discharged him. The truck driver then sued for wrongful discharge. *Id.* at 656.

The *DeSoto* Court found that, under these facts, the truck driver could not make out a claim for retaliatory discharge. It determined, *inter alia*,[4] that "no fundamental public policy concern was involved. . . ." *Id.* at 659. The *DeSoto* Court explained its reasoning:

---

[4]The *DeSoto* Court stated,

We emphasize that this is not a case of "whistleblowing;"' rather, it is a flat-out refusal to work and therefore we view it differently. . . . We have instead a claim by an employee who refuses to work based on his erroneous belief that what he was asked to do was a violation of California law.

957 F.2d at 658 (citations omitted).

The act DeSoto thought was illegal, operating a trailer without registration papers, does not implicate fundamental public policy concerns, such as health, safety, or crime prevention, for which wrongful discharge actions have been recognized to date in California. DeSoto was not asked to perform an act hazardous to his health or safety. Instead, we view the failure to carry registration papers simply as one of the "[m]any statutes [that] impose requirements whose fulfillment does not implicate fundamental public policy concerns."

*Id.* at 658-59 (citations omitted). As in *DeSoto*, in this case, operating a commercial vehicle with a photocopied cab card does not implicate "important public policy" concerns for which retaliatory discharge actions have heretofore been recognized in Tennessee. *See Guy*, 79 S.W.2d at 538. Franklin was "not asked to perform an act hazardous to his health or safety." *DeSoto*, 957 F.2d at 659. Much like the perceived infraction in *DeSoto*, Tenn. Comp. R. & Regs. 1340-5-2-.02, requiring a commercial vehicle to carry the original cab card as opposed to a photocopy, can only be characterized as one of the many regulations that impose "requirements whose fulfillment does not implicate fundamental public policy concerns." *Id.* (quoting *Foley v. Interactive Data Corp.*, 765 P.2d 373, 379 (Cal. 1988)).

Therefore, we must conclude that under both the Tennessee Public Protection Act and the common law, the regulatory infraction by Swift on which Franklin relies does not implicate "fundamental public policy concerns" and Franklin's refusal to drive the truck with a photocopy of the cab card did not serve to further an important public policy interest embodied in the law. *See DeSoto*, 957 F.2d at 659; *Guy*, 79 S.W.3d at 538. Consequently, his claim for retaliatory discharge must fail, and the trial court's judgment in favor of Franklin must be reversed.

This holding pretermits all other issues raised on appeal.

The decision of the trial court is reversed and the claim of Plaintiff/Appellee Anthony Franklin is dismissed. Costs on appeal are assessed against Plaintiff/Appellee Anthony Franklin, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, J.